## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

ACOSTA, INC.,
6600 Corporate Center Parkway
Jacksonville, Florida 32216

      Plaintiff,

      v.

JOSEPH NAVITSKY
5155 Cassidy Drive
Schnecksville, Pennsylvania 18078

and

JOHNSON O'HARE CO., INC.,
1 Progress Road
Billerica, Massachusetts 01821

      Defendants.

CASE NO.

JUDGE

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
### WITH JURY DEMAND

Plaintiff Acosta, Inc. ("Acosta"), by and through its undersigned counsel, avers the following as its Complaint for Injunctive and Other Relief against Defendants Joseph Navitsky ("Navitsky") and Johnson O'Hare Co., Inc. ("JOH") (collectively, "Defendants").

### PARTIES

1.    Acosta is a Delaware corporation with its principal place of business at 6600 Corporate Center Parkway, Jacksonville, Florida 32216.

2.    Acosta and its affiliated companies are the leading outsourced sales and marketing agency serving consumer packaged goods companies and retailers across the United States and Canada. Acosta's brokerage business represents food and beverage manufacturers (known as "clients") in marketing their products to major retailers and other channels (known as

"customers"), including club stores, convenience stores, drug stores, food service, grocery stores, mass merchandisers, military sales, natural or other specialty stores, and value retailers.

3.      Navitsky is an adult individual and Pennsylvania citizen residing at 5155 Cassidy Drive, Schnecksville, Pennsylvania 18078.

4.      Navitsky was employed by Acosta as Director of Fresh Foods for the Northeast region, including Pennsylvania, from on or about January 23, 2015 until his resignation on or about June 26, 2017, when he went to work for JOH.

5.      JOH is a Massachusetts corporation with its principal place of business at 1 Progress Road, Billerica, Massachusetts 01821, which is licensed to do business in Pennsylvania.

6.      JOH is a food and beverage broker that directly competes with Acosta.

## JURISDICTION & VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), insofar as Acosta is a citizen of Delaware and Florida, Navitsky is a citizen of Pennsylvania, and JOH is a citizen of Massachusetts and the amount in controversy exceeds $75,000.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), insofar as Navitsky resides in this District and the events alleged herein occurred primarily in this District.

## FACTUAL BACKGROUND

### The Food and Beverage Brokerage Industry

9.      The food and beverage brokerage business is based substantially on relationships, both with clients and customers.  Client relationships are particularly valuable because the client generally retains the broker as its representative in sales channels and pays brokers a commission based on product sales in those channels.  As a result, Acosta invests substantial amounts of money each year to develop, maintain, and enhance its client relationships.

10.     Because the number of potential clients is limited and brokers are constantly endeavoring to increase market share, the food and beverage brokerage business is also highly competitive. In each segment of the business, multiple brokers compete with Acosta for its clients. Acosta maintains its competitive advantage not only through superior service and results, but also through its knowledge of its clients' products, pricing, preferences, marketing plans and strategies, and market differentiators. This information is confidential to both Acosta and its clients.

*Acosta Acquires Dynamic Food Marketing, LLC and Employs Levine and Brown*

11.     In February 2010, Morris Alper, LLC, a wholly owned subsidiary of Acosta, purchased the assets of Dynamic Food Marketing, LLC ("Dynamic"), a competing food brokerage business specializing in representing producers of meat, deli and cheese products. Morris Alper, LLC, Robert I. Levine ("Levine"), and Dynamic entered into an Asset and Brokerage Relationship Purchase Agreement (the "APA") at that time.

12.     Levine was Dynamic's principal and was heavily involved in Dynamic's operations. Accordingly, Levine was a party to the APA. Acosta subsequently merged with Morris Alper, LLC effective December 31, 2012.

13.     Due to the client-centered nature of the food and beverage brokerage industry, a critical component of the purchase was Acosta's acquisition of Dynamic's and Levine's existing personal relationships and contacts developed and maintained by Dynamic with its clients (the "Brokerage Relationships"). Among the Brokerage Relationships that Acosta acquired through its purchase of Dynamic were Lactalis American Group ("Lactalis"), Allen Foods ("Allen"), and part of the brokerage relationship with Kayem Foods ("Kayem").

14.     Acosta knew that the Brokerage Relationships were largely based on Levine's

personal relationships with the clients. Thus, to ensure that Acosta would realize the full benefit of the Brokerage Relationships it purchased, Acosta required Levine to become an Acosta employee and enter into an Employment Agreement following the acquisition. A true and correct copy of Levine's Employment Agreement is attached hereto as Exhibit A and is fully incorporated herein by reference.

15.     In Levine's Employment Agreement, Levine acknowledged that he had access to certain Confidential Information about Acosta's business and promised that he would not disclose, directly or indirectly, any of such Confidential Information to any person, firm, corporation, or other entity for any reason or purpose whatsoever unless specifically authorized to do so in writing by an authorized officer of Acosta. *See* Ex. A. The Agreement defines "Confidential Information" as "business, financial, and marketing data and information, materials, correspondence, ideas, improvements, know-how, trade secrets, techniques, protocols, procedures, technology, research, specifications, plans and/or any other materials relating to the businesses, operations or prospects of Acosta and its affiliates." *Id.*

16.     Acosta also required Levine to agree to a non-compete restriction in the APA prohibiting him from competing with Acosta during the term of the purchase price payments from Acosta, which ran through and included March 20, 2017. A true and complete copy of the non-compete section of the APA is attached here as Exhibit B and is fully incorporated herein by reference.

17.     After the sale of Dynamic, Levine served for approximately seven years as a Vice President of Acosta's Fresh Foods division. In this capacity, he managed a team of employees engaged in the brokerage of clients' products, including Barbara Brown ("Brown"), a Business Manager who worked closely with Levine to service Acosta's clients, and specifically the

4

Brokerage Relationships that Acosta had purchased from Dynamic and Levine.

18.     On February 1, 2010, prior to and as a condition of her employment, Brown executed Acosta's Non-Solicitation Agreement, pursuant to which she agreed, among other things, not to solicit Acosta's clients on behalf of any other person for a period of twelve months after termination of her employment and not to disclose Acosta's Confidential Information to any person, use it for any other person's benefit, or provide it for use by any other person. Brown's Non-Solicitation Agreement defines "Confidential Information" to include, *inter alia*, Acosta's Trade Secrets, Accounts, pricing and cost information related to the Business and Accounts and contract terms with existing and prospective clients, accounts, and prospects. A true and correct copy of Brown's Non-Solicitation Agreement is attached hereto as Exhibit C and is fully incorporated herein by reference.

*Levine Resigns from Acosta*

19.     On January 25, 2017, less than two months before the final payment was due to Levine under the APA, Levine informed Acosta he would be resigning effective May 1, 2017. The payments of the purchase price by Acosta to Levine would continue until March 20, 2017.

20.     During the time between the announcement and the effective date of Levine's resignation, he repeatedly requested assurances from Acosta that the non-competition covenants in the APA and his Employment Agreement were no longer in effect. Acosta agreed that after the final purchase price installment on March 20, 2017, Levine would no longer be bound to his restrictive covenants but the confidentiality obligations in his Employment Agreement and any other provisions of the APA that survived termination would continue.

21.     Upon information and belief, prior to the effective date of Levine's resignation from Acosta, while he was still bound by the non-competition covenant in the APA and by

fiduciary duties to Acosta, Levine conspired with JOH to take from Acosta the Brokerage Relationships for which Acosta had paid Levine millions of dollars over the previous seven years, as well as other Acosta client relationships, through the solicitation of key Acosta employees and via the misappropriation of Acosta's Confidential Information.

22.     Beginning approximately one month before Levine's resignation and continuing through the present day, at least three key Acosta associates, including Navitsky, who were directly involved in managing the relationships with Acosta's clients, including the Brokerage Relationships, have resigned and accepted employment with JOH.

23.     Additionally, all of the Brokerage Relationships (Lactalis, Kayem, and Allen) and an additional Acosta client with whom Navitsky worked, Sartori Company ("Sartori"), have terminated their brokerage relationships with Acosta and become clients of JOH.  The annual revenues to Acosta from these clients alone is approximately $1.9 million.

24.     Multiple clients terminating their relationships with Acosta within weeks of each other, and all moving to JOH, is highly suspect.

25.     Suspecting foul play following Levine's departure, Acosta had its forensic experts review Levine's computer.  They found an absence of any work activity, documents, or emails remaining on Levine's computer.  Acosta's forensics experts accordingly believe that the computer was intentionally "wiped clean" of all business information, documents, and emails.

*Brown Resigns and Downloads and Sends Acosta's Confidential Information to JOH and Levine*

26.     Brown resigned her employment with Acosta on May 12, 2017.

27.     On or about June 9, 2017, Acosta received an email inadvertently sent to Levine's Acosta email account from Brown's personal email account.

28.     This email included contact information for a representative of a longtime Acosta

client. In the email, Brown asked Levine to have JOH send the Acosta client some "info" and for JOH to contact the client. A true and correct copy of Brown's email is attached hereto as Exhibit D and is fully incorporated herein by reference (the "Brown Email").

29.     As a result of receiving Brown's email, Acosta conducted a forensic review of Brown's Acosta computer. According to the forensics experts, on April 27, 2017, Brown connected a flash drive to her Acosta computer and accessed information she had stored on the flash drive, including Confidential Information related to two Acosta clients she was managing.

30.     This forensic review further revealed that, in the three days before her departure, May 10–12, 2017, the forensic review of Brown's computer evidences that she rapidly accessed Acosta Confidential Information relating to Acosta clients and customers. This unusual behavior indicates that Brown transferred this information to a flash drive or other remote storage device.

31.     On May 30, 2017, Acosta's counsel wrote a letter to Brown asking her to explain this suspicious pattern of conduct and why she was sending emails to Levine for JOH's benefit.

32.     Responding to this letter through counsel, Brown did not deny a relationship with JOH, but said that she transferred Acosta files to a flash drive in order to "clean up" her emails and then gave the flash drive to her administrative assistant.

33.     However, when Acosta retrieved the flash drives that Brown had left behind, the files contained on the drives were not consistent with the files that Brown had accessed on Acosta's computer system per Acosta's forensic review. Thus, Acosta believes that Brown remains in possession of substantial amounts of Acosta's Confidential Information, as defined in her Non-Solicitation Agreement, *see* Ex. B § 5(b), and is providing it to JOH.

34.     Upon information and belief, Brown misappropriated Acosta's Confidential Information for the purpose of providing that information to Levine and JOH, in order to

7

facilitate a JOH plan to obtain the benefit of the Brokerage Relationships and Acosta's other client relationships.

*Navitsky's Agreement and Employment with Acosta*

35.     Defendant Navitsky joined Acosta in January 2015 as its Director of Fresh Foods for the Northeast region, including Pennsylvania.

36.     Given the competitive nature of the food and beverage business, Navitsky was also required to and did agree to be bound by Acosta's Non-Solicitation Agreement dated January 23, 2015 (a true and correct copy of which is attached hereto as Exhibit E and is fully incorporated herein by reference) by signing Acosta's employee Orientation Acknowledgement Form (a true and correct copy of which is attached hereto as Exhibit F and is fully incorporated herein by reference) (collectively, the "Agreement") prior to and as a condition of his employment with Acosta.

37.     In his capacity as the Director of Fresh Foods, Navitsky had substantial contact with and exposure to Acosta's clients, including Sartori and Lactalis, as well as exposure to Acosta's confidential information related to its client prospects, marketing and business strategies, and customer relationships among other things (collectively, and as further defined in the Agreement, the "Confidential Information"). *See* Ex. E § 5(b).

38.     Recognizing that Navitsky would necessarily gain such access to Acosta's valuable clients and Confidential Information in this competitive industry, the Agreement was and is designed to protect Acosta's business by prohibiting Navitsky from soliciting Acosta's clients and misappropriating Acosta's Confidential Information. *See id.* § 2.

39.     The Agreement states:

Employee agrees that for a period of twelve (12) months following termination by Employee, for any reasons, including resignation, . . . Employee shall not, on

Employee's own behalf or on behalf of others, in any capacity whatsoever, including, without limitation, as an owner, salesperson, sales manager, consultant, or otherwise, directly or indirectly, engage in the business of selling, soliciting, or promoting the sale of the Clients that Employee represented while employed by Acosta.

In recognition and consideration of Acosta's Business, and other legitimate business interests, Employee agrees that while Employee is employed by Acosta, and for a period of one (1) year following termination of such employment (whether voluntary or involuntary), Employee shall not, directly or indirectly solicit or discuss with any employee of Acosta the employment of such Acosta employee by any other commercial enterprise other than Acosta, nor recruit, attempt to recruit, hire or attempt to hire any such Acosta employee on behalf of any commercial enterprise other than Acosta.

*Id.* § 4(a)(i), (b).

40.     The Agreement further states:

Employee agrees that while Employee is employed by Acosta, and for a period of one (1) year following termination of such employment (whether voluntary or involuntary), Employee shall not (i) disclose to any other person or entity; (ii) use for the benefit of Employee or persons or entities other than Acosta; or (iii) provide for use by other persons or entities, the "Confidential Information" of Acosta. . . .

*Id.* § 5(a).

## *Navitsky Resigns from Acosta and Solicits Acosta's Clients at JOH*

41.     On or about June 26, 2017, Navitsky tendered his resignation to Acosta in order to accept a position with JOH, Acosta's direct competitor.

42.     Because it was aware that Navitsky was going to a competitor, on or about July 5, 2017, Navitsky's supervisors reminded him, both verbally and in writing, of his contractual obligations under the Agreement not to solicit Acosta's clients or misappropriate Acosta's Confidential Information. A true and correct copy of the letter Acosta sent to Navitsky on this date is attached hereto as Exhibit G and is fully incorporated herein by reference.

43.     Navitsky and his new employer, JOH, were thus well aware of Navitsky's contractual obligations to Acosta. Nonetheless, Navitsky, with the knowledge and

encouragement of JOH, has proceeded to improperly solicit and work on the business of

Acosta's former clients, with whom he worked while employed by Acosta, including Sartori and

Lactalis (as discussed below), and to misappropriate Acosta's Confidential Information to benefit

himself and JOH at Acosta's expense.

44.     On or about July 14, 2017, Acosta received an email inadvertently sent to

Navitsky's Acosta email account from Acosta client Sartori, attaching a spreadsheet containing

forms for the brokerage of Sartori products to customers. Two of the three forms were blank, but

the first request form detailed the sale of Sartori products to Acosta customer Wakefern Food

Corporation ("Wakefern"), listing JOH as the broker and Navitsky as the originator. A true and

correct copy of this email is attached hereto as Exhibit H and is fully incorporated herein by

reference (the "Sartori Email").

45.     Further, on or about July 18, 2017, Acosta received another email inadvertently

sent to Navitsky's Acosta email account from Acosta customer Ahold Delhaize ("Ahold"). This

email included an attached calendar invite for an August 1, 2017 joint "planning discussion"

involving representatives from Ahold, Acosta client Lactalis, Navitsky, and another JOH

representative. A true and correct copy of this email is attached hereto as Exhibit I and is fully

incorporated herein by reference (the "Lactalis Email").

46.     During his employment with Acosta, Navitsky was responsible for managing

Acosta's relationships between both Sartori and Wakefern and Lactalis and Ahold. In the

process of managing these relationships, Navitsky necessarily learned a great deal of

Confidential Information about those clients and the customers which would be of great value to

JOH or any competitor.

47.     These emails are direct evidence of Navitsky's improper solicitation of Sartori

and Lactalis and associated misappropriation of Acosta's Confidential Information for the benefit of JOH during and immediately following Navitsky's employment with Acosta, in direct violation of his non-solicitation Agreement. Not only is Navitsky managing these clients in the same customer relationships that he managed at Acosta, but in doing so he is also necessarily using the Confidential Information that he acquired in the course of his employment at Acosta.

48.     JOH has improperly facilitated and is continuing to improperly facilitate Navitsky's solicitation of and working on the business of these former Acosta clients and associated misappropriation of Acosta's Confidential Information, including but not limited to the above examples, despite JOH's knowledge of Navitsky's obligations under the Agreement.

49.     Aside from Navitsky, JOH has also improperly interfered with Acosta's contractual relationships with Levine and Brown, specifically their ongoing confidentiality obligations, as referenced above.

### COUNT I
### Breach of Contract
### *Acosta v. Navitsky*

50.     Acosta incorporates all preceding paragraphs as if expressly stated herein.

51.     As a condition of his employment with Acosta, Navitsky agreed to be bound by the reasonable terms of the Agreement. *See* Exs. E–F.

52.     The Agreement, which remains a valid and binding contract, prohibits Navitsky from soliciting Acosta's clients during his employment and for one year thereafter within the same geographic area. *See* Ex. E § 4(a)(i), (b), (c).

53.     The Agreement further prohibits Navitsky from misappropriating Acosta's Confidential Information, *see id.* § 5, something necessarily incidental to the solicitation and subsequent servicing of Acosta's clients.

11

54.     By engaging in the above-described conduct, Navitsky has breached and is continuing to breach his contractual obligations under the Agreement.

55.     Acosta has suffered and will continue to suffer damages as a result of Navitsky's conduct.  Acosta will suffer additional and irreparable harm if Navitsky's conduct is not enjoined and he is allowed to solicit and service Acosta clients.

56.     For breaches and threatened breaches of the Agreement, Acosta is contractually entitled to an award of injunctive relief and associated attorneys' fees, costs, actual damages, and any other available relief. *See id.* § 6.

## COUNT II
### Tortious Interference with an Existing Business and Contractual Relationships
### *Acosta v. JOH*

57.     Acosta incorporates all preceding paragraphs as if expressly stated herein.

58.     At all times relevant hereto, Navitsky, Levine, and Brown were each employees or former employees of Acosta, bound by contractual obligations prohibiting them from soliciting Acosta's clients or misappropriating Acosta's Confidential Information. *See* Exs. A–C, E–F.

59.     Sartori and Lactalis, were each longtime, existing Acosta clients at or around the time of Navitsky's resignation, and Kayem and Allen were longtime, existing Acosta clients at or around the time of Levine's and Brown's resignations.  The other clients about whom Brown downloaded Confidential Information are also longtime clients of Acosta.

60.     Upon information and belief, JOH purposefully, without justification and in the absence of privilege, and with knowledge of Navitsky's, Levine's, and Brown's respective contractual obligations under their agreements with Acosta, wrongfully acted to entice each of them to resign from Acosta and to join JOH and breach their contractual obligations by having

encouraged and continuing to encourage them to solicit Acosta's clients and misappropriate Acosta's Confidential Information.

61.     JOH did this with the specific intent to harm the contractual relationships between Acosta and each of Navitsky, Levine, and Brown and Acosta's business relationships with its clients, including but not limited to Sartori, Lactalis, Kayem, and Allen.

62.     As a result of JOH's conduct, Acosta has suffered and will continue to suffer damages.

63.     Furthermore, Defendants threaten to disrupt other Acosta client relationships, including other clients with whom Navitsky, Brown, and Levine worked while at Acosta and the clients about whom Brown has downloaded stolen Acosta Confidential Information.

**WHEREFORE,** Acosta prays that (1) judgment be entered in its favor and against Defendants Navitsky and JOH; (2) Acosta be awarded temporary, preliminary, and permanent injunctive relief to prohibit (a) Navitsky from further violating the Agreement and (b) JOH from continuing to tortiously interfere with Acosta's contractual relationships with its former employees, including Navitsky, Levine and Brown, from using Acosta Confidential Information to interfere with Acosta's relationships with its clients; (3) Acosta be awarded actual damages, in an amount to be determined at trial, along with interest, attorneys' fees, and costs in accordance with the Agreement; (4) Navitsky and JOH be ordered to return any Confidential Information obtained from Acosta either directly or indirectly from any of Acosta's former employees; and (5) such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

Michael R. Phillips *(pro hac vice to be filed)*
MCGUIREWOODS LLP
77 West Wacker Drive, 41st Floor
Chicago, IL 60601
(312) 849-8100
(312) 849-3690 (Facsimile)
mphillips@mcguirewoods.com

Karla L. Johnson
*Admitted in the E.D. of Pennsylvania*
Pa. Id. No. 307031
MCGUIREWOODS LLP
625 Liberty Avenue, 23rd Floor
Pittsburgh, Pennsylvania 15222
(412) 667-6000
(412) 667-6050 (Facsimile)
kjohnson@mcguirewoods.com

*Counsel for Plaintiff*

Dated: July 21, 2017