IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ACOSTA, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. 17-3282 |
| v. | : | |
| JOSEPH NAVITSKY and JOHNSON O'HARE CO., INC., | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                                         March 12, 2018

Pending before the court is the plaintiff's amended motion for a preliminary injunction. The plaintiff contends that the defendants, a former employee and his new employer, violated contractual duties, improperly solicited clients, tortuously interfered with contractual relationships, and stole trade secrets. Accordingly, the plaintiff asks the court to enter a preliminary injunction barring the defendants from further contractual breaches, further solicitation of clients, and further use of trade secrets. Ultimately, however, the record created by the parties does not support the plaintiff's allegations.

The record reveals that the defendants likely did not breach contractual duties, likely did not improperly solicit the plaintiff's clients, likely did not tortuously interfere with the plaintiff's contractual relationships, and likely have not used or possessed trade secrets belonging to the plaintiff. Because the record does not support the plaintiff's allegations, the plaintiff fails to establish the two most critical factors necessary for the court to award preliminary injunctive relief. Consequently, the court will deny the motion.

I.     PROCEDURAL HISTORY

On July 24, 2017, the plaintiff, Acosta, Inc. ("Acosta"), filed a complaint alleging (1) that the defendant, Joseph Navitsky ("Navitsky"), its former employee, breached a contractual agreement with Acosta, and (2) that the other defendant, Johnson O'Hare, Inc. ("JOH"), Navitsky's new employer, tortuously interfered with Acosta's business and contractual relationships. *See* Compl., Doc. No. 1. On the same day, Acosta also moved for a preliminary injunction against both defendants. *See* Mot. for Prelim. Inj., Doc. No. 3. Acosta sought to have the court enjoin Navitsky from soliciting Acosta clients, using Acosta's confidential information, and from otherwise breaching his contractual agreement. *See id.* Similarly, Acosta sought to have the court enjoin JOH from tortuously interfering with Acosta's relationships with Acosta employees and from using any of Acosta's confidential information JOH may have obtained. *See id.*

On August 11, 2017, Navitsky filed a motion to dismiss. Doc. No. 17. One week later, on August 18, 2017, JOH also filed a motion to dismiss. Doc. No. 19. Although Acosta filed responses to the motions to dismiss, it subsequently moved for leave to file an amended complaint on September 7, 2017. Doc. Nos. 23, 25, 28. On September 20, 2017, the court granted Acosta's motion and directed the clerk of court to docket the proposed amended complaint that was attached to the motion.[1] Doc. No. 34. On the same date, the clerk of court docketed the amended complaint. Doc. No. 35. Acosta's amended complaint added three counts against both defendants: violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), violation of the Federal Defend Trade Secrets Act ("DTSA"), and a common law claim of unjust enrichment. *See id.*

---

[1] The court entered an order on September 8, 2017, which stayed the matter pending a settlement conference with Magistrate Judge Marilyn Heffley. Unfortunately, the parties were unable to resolve the matter, so the court also lifted the stay as part of the September 20, 2017 order. *See* Order at 1, Doc. No. 34.

Shortly thereafter, Acosta filed an amended motion for preliminary injunctive relief. Doc. No. 37. With the exception of minor changes (the word "temporary" was removed in two places, and an additional injunction was requested against JOH), the amended motion was essentially the same as the original one. *Compare* Doc. No. 3, *with* Doc. No. 37. Navitsky renewed his motion to dismiss, and JOH filed a new motion to dismiss on October 5, 2017. Doc. Nos. 39, 40.

Navitsky filed a response in opposition to the amended motion for a preliminary injunction on October 27, 2017. Doc. No. 47. Pursuant to the court's request, the parties filed proposed findings of fact and conclusions of law on October 30, 2017. Doc. Nos. 48, 49, 50. JOH filed a response in opposition to the amended motion for a preliminary injunction on October 31, 2017. Doc. No. 51. The court then held an evidentiary hearings on the amended motion for a preliminary injunction on November 1, 2017, December 7, 2017, and December 21, 2017. Doc. Nos. 54, 59, 61. The amended motion for a preliminary injunction is now ripe for adjudication.

## II. FINDINGS OF FACT

In accordance with Federal Rule of Civil Procedure 52(a), the court's findings of fact are as follows:

**I. Background**

1. Acosta is a "a sales and marketing agency that services consumer product goods companies." Tr. Nov. 11, 2017 at 9 ("Tr. I"), Doc. No. 55. In other words, Acosta is a food broker. *See id.* at 24.

2. As a food broker, Acosta assists food and beverage manufacturers by placing their products with retailers. *See id.* at 9–10.

3. JOH is also in the food brokerage business; JOH and Acosta are competitors. *See id.* at 23.

4. Lactalis and Sartori were, at one point in time, both represented by Acosta's Fresh Foods division in the Northeastern United States. *See id.* at 12.

5. Fresh Foods is the portion of a grocery store that typically contains foods such as "meat, seafood, produce, deli, retail food service, specialty cheese, [and the] in store bakery." *Id.* at 11.

6. Both Lactalis and Sartori are specialty cheese producers. *See id.* at 12.

7. Lactalis offers some other dairy products. *See id.*

8. Acosta's Fresh Foods division no longer represents Lactalis or Sartori in the Northeastern United States: Lactalis left in May 2017, *see id.* at 24, and Sartori left in June 2017, *see id.* at 25.

9. JOH's Fresh Foods division now represents Lactalis and Sartori in the Northeastern United States. *See id.* at 23–25.

## II. Joseph Navitsky's Employment at Acosta

10. Joseph Navitsky was the director of Fresh Foods at Acosta for the Metro New York and Mid-Atlantic regions. *See id.* at 14.

11. Navitsky was responsible for, and worked closely with, Sartori and Lactalis when Acosta's Fresh Foods division represented them. *See id.* at 18–21.

12. As part of his employment with Acosta, Navitsky signed an Orientation Acknowledgement Form. *See* Navitsky Ex. 8.

13. The Orientation Acknowledgement Form references a Non-Solicitation Agreement. *See id.*

14. Navitsky did not sign the Non-Solicitation Agreement. *See* Navitsky Exhibit 7; Tr. I at 16.

15. Navitsky resigned from his employment at Acosta in June 2017, to work at JOH. Tr. I at 21, 23.

16. Navitsky did not solicit Lactalis or Sartori to join JOH. *See id.* at 106, 135, 220, 239. Furthermore, he is not soliciting Acosta clients in his role at JOH. *See id.* at 265–67. Rather, he now focuses on the customer servicing aspect of the business. *See id.*

### III. The Facts Giving Rise to this Lawsuit

17. In addition to losing Navitsky to JOH, Acosta recently lost other associates to JOH. *See id.* at 23. Of note to this motion, Barbara Brown and Robert Levine had recently left Acosta to join JOH. *See id.* at 67–68. Consequently, Acosta was worried that JOH was stealing Acosta's clients and associates in an effort to infringe on Acosta's Fresh Foods market space in the Northeastern United States. *See id.*

18. Shortly after Navitsky tendered his resignation, Acosta came to believe that he was servicing Lactalis in violation of the Non-Solicitation Agreement. *See id.* at 27.

19. Acosta received a calendar invitation sent to Navitsky's Acosta e-mail indicating that Navitsky was planning to meet with Lactalis to perform a business review "on behalf of Lactalis at the customer Ahold Stop and Shop." *Id.*

20. Acosta received similar correspondence inadvertently sent to Navitsky's Acosta e-mail indicating that Navitsky was servicing or planning to service Sartori at JOH. *See id.* at 27–28.

5

21. Upon leaving Acosta, Navitsky retained some Acosta files and documents. *See, e.g.*, *id.* at 28–33. Acosta believed that this information was proprietary and confidential. *See id.* at 28–33, 42.

22. Navitsky informed one of his supervisors at Acosta, Deborah Columbo, and a co-worker, Lisa Podesta, that he was retaining various files. *See id.* at 218 ("Q. So you let them know that you had retained copies of the documents[?] A. Well yeah . . . .").

23. Navitsky retained these files to help service Acosta clients during his transition from Acosta to JOH.[2]

24. At one point in time, Navitsky may have had Acosta documents on five devices: his MacBook Pro laptop; his external hard drive; the "162 thumb drive;" his JOH laptop computer; and the "460 thumb drive." *See* Tr. Dec. 7, 2017 ("Tr. II") at 5–8, 26–27, Doc. No. 69. The first four devices (all of them except for the 460 thumb drive) had been wiped or destroyed and no documents are recoverable from those devices. *See id.* at 5-8.

25. Navitsky Exhibit 36 "is a true, correct, and complete copy of the original file listing report" of the files on the 460 thumb drive. *See id.* at 6. Acosta Exhibit 206 is substantively identical to Navitsky Exhibit 36. *Id.*

26. The 460 thumb drive is the only device identified at the hearing that may have once contained Acosta documents that is still in Navitsky's possession. *See id.* at 1–30.

27. Acosta has not specifically identified any files in the listing report that they believe are Acosta documents.

---

[2] This was a hotly contested issue at the evidentiary hearing. While Mr. Navitsky arguably should not have retained Acosta documents, the court finds his testimony regarding his reasons for doing so to be credible. Specifically, Navitsky took his role at Acosta seriously and genuinely desired to assist both Acosta and his Acosta clients to the best of his ability during his transition from Acosta to JOH. *See* Tr. I. at 217.

28. The 460 thumb drive is Navitsky's personal thumb drive. *See id.* at 19 ("That's my personal or family's personal thumb drive, where we keep documents.").

29. Navitsky connected the thumb drive to his MacBook computer on August 5, 2017, and August 9, 2017, to remove and save personal files that were on the computer. *See id.* at 19–26.

30. Navitsky desired to retain personal files because, at Acosta's request, he was going to turn over the MacBook. *See id.* at 20.

31. The 460 thumb drive no longer contains any Acosta documents.[3] *See id.* at 21–26.

32. Navitsky no longer has any confidential or proprietary Acosta documents in his possession.[4]

### III. DISCUSSION

Acosta seeks injunctive relief on three grounds: (1) violation of the Non-Solicitation Agreement by Navitsky; (2) tortuous interference with contractual relationships by JOH; and (3) misappropriation of trade secrets by both JOH and Navitsky.[5] *See* Mem. of Law in Supp. of Pl.'s Am. Mot. for Injunctive Relief ("Pl.'s Mem."), Doc. No. 37-2. The familiar standard for whether a court should issue injunctive relief is:

---

[3] The court found Navitsky's testimony on this point to be credible. Additionally, as noted in finding of fact twenty-seven, Acosta has not specifically identified any files in this report that Acosta believes belong to it. Rather, Acosta attempted to show a "smoking gun" through the use of their expert. *See* Tr. I at 143–45. Specifically, they attempted to show that Navitsky had deleted information from the document. *Id.* This was later revealed to be a red herring. *Id.* at 154 (counsel for Navitsky explaining why there were missing columns). Moreover, the parties have now stipulated that this document, Navitsky Exhibit 36, "is a true, correct, and complete copy of the original file listing report." Tr. II at 6.

[4] This was another contentious issue at the evidentiary hearing. The court found Navitsky's testimony that he no longer has Acosta documents in his possession to be credible. *See* Tr. I at 246, 265–66; Tr. II at 11–28.

[5] Acosta's complaint also raises a count for unjust enrichment. Acosta, however, does not assert this as a ground for granting a preliminary injunction. *See* Mem. of Law in Supp. of Pl.'s Am. Mot. for Injunctive Relief, Doc. No. 37-2. Consequently, the court will not address it in this opinion.

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 496 (E.D. Pa. 2000) (citation omitted).

The Third Circuit recently explained that these are to be weighed as factors, not applied like elements. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The Third Circuit also explained that the most "critical factors" are the first two. *See id.* A plaintiff must first establish that he or she has a "reasonable probability of success on the merits" and that he or she will be "irreparably injured by denial of the relief." *See id.* at 176–79. Moreover, these first two factors are to be balanced against each other: "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 179 (quotation marks and citation omitted). Because Acosta fails to establish the first two elements, the court will not address elements three and four.

As for the first two elements, the court will address irreparable injury first. The irreparable injury analysis is similar for each claim asserted by Acosta, whereas the reasonable probability of success analysis varies significantly for each claim. Consequently, it will be more effective for the court to analyze the reasonable probability factor for each claim after already considering the irreparable injury factor.

### A. <u>Irreparable Injury to Movant</u>

Acosta argues that it is at risk of irreparable injury because not only has JOH already solicited Lactalis and Sartori, but "other Acosta client relationships are at risk of improper

8

solicitation and misuse of Confidential Information, particularly those clients about whom Navitsky downloaded and stole Confidential Information." Pl.'s Mem. at 24. This assertion is not supported by the evidence in the record.

Lactalis and Sartori have already terminated their relationship with Acosta. Moreover, Navitsky did not solicit them to join JOH. *See* Tr. I at 106, 135, 220, 239. Regarding the "other Acosta client relationships," Navitsky is not currently soliciting any Acosta clients. *See id.* at 220. Navitsky now focuses on customer relations; not client relations.[6] *See id.* at 265–66. Additionally, as noted above, the court finds that Navitsky no longer possesses any Acosta confidential information. Consequently, the court disagrees with Acosta that "other Acosta client relationships are at risk of improper solicitation and misuse of Confidential Information . . . ." Pl.'s Mem. at 24.

Acosta also contends that under the PUTSA and the DTSA, it is entitled to an injunction to eliminate damages arising from "actual [or] threatened misappropriation" of its trade secrets. *Id.* Similar to Acosta's arguments surrounding client solicitation, the record does not support Acosta's contention that Navitsky stole trade secrets belonging to Acosta. In fact, as explained below, it is unlikely that Acosta has established the existence of any trade secrets in this case. Consequently, the record does not support the existence of a risk of "actual or threatened misappropriation" of trade secrets.

In sum, the court determines that the harm an injunction would prevent here is incredibly small—likely none at all. However, because *Reilly* advises courts to consider both of the first two factors, the court will nonetheless address the second factor as well. *See* 858 F.3d at 179.

---

[6] In the food brokerage business, consumer product goods companies, such as Lactalis and Sartori, are clients, whereas retailers, such as Wakefern and Ahold, are customers. *See* Tr. I at 9–10.

9

### B. Probability of Success on the Merits

A court evaluating a motion for a preliminary injunction should consider whether the movant has shown a "reasonable probability of success on the merits." *Napolitano*, 85 F. Supp. 2d at 496. A reasonable probability of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179. "[M]ore than a mere possibility of relief is required." *Id.* at 179 n. 3 (citation and quotation marks omitted). The court will address Acosta's likelihood of success on the merits on each of the three grounds Acosta asserts: (1) breach of contract, (2) tortious interference, and (3) misappropriation of trade secrets.

#### 1. Breach of the Non-Solicitation Agreement

Acosta contends that it has a reasonable probability of success on the merits against Navitsky because Navitsky breached a binding and enforceable contract. *See* Pl.'s Mem. at 12, 16–18. Specifically, Acosta contends that Navitsky breached the Non-Solicitation Agreement. *See id.* at 12; Navitsky Ex. 7. In response, Navitsky argues that he is not bound by the terms of the Non-Solicitation Agreement because he never signed it. Def. Joseph Navitsky's Mem. of Law in Opp'n. to Pl.'s Am. Mot. for Injunctive Relief at ECF p. 17 ("Navitsky's Mem."), Doc. No. 47. Rather, he signed only the Orientation Acknowledgement form. *See* Navitsky Ex. 8. While the Orientation Acknowledgement references the Non-Solicitation Agreement, *see id.*, it also states that

> the information and content contained in these items is designed to serve as a guideline for action, and is not intended to create any contract or binding agreement between Acosta Sales & Marketing and any associate. . . . No provision or portion of these items constitutes an implied or express contract . . . .

*Id*. Furthermore, the form provides that Acosta can unilaterally "change, modify, eliminate, or deviate from any policy or procedure at any time . . . ." *Id.*

In response, Acosta points to the provision of the form that states: "I hereby acknowledge that I have viewed/read the required items listed above, and that *I agree to fully comply with each*." *See id.* (emphasis added); Pl.'s Mem. at 17. In light of this language, Acosta argues that the form and the Non-Solicitation Agreement should be read in conjunction to form a single binding contract. *See* Pl.'s Mem. at 17. Under Florida law, an acknowledgement form can be read in conjunction with another document to create a single contract; however, to accomplish this, the acknowledgement form must show intent to incorporate the other document because "mere reference to another document is not sufficient to incorporate that other document into a contract . . . ." *Temple Emanu-El of Greater Fort Lauderdale v. Tremarco Indus., Inc.*, 705 So. 2d 983, 984 (Fla. 4th Dist. Ct. App. 1983).[7]

Acosta argues that this intent is present in the Acknowledgement Form. In addition to their argument that the signee agrees to "fully comply with [the items listed above]," the Non-Solicitation Agreement and the Confidentiality Agreement are the only two items on the list that contain the word "agreement." *See* Navitsky Ex. 8; *see also* Pl.'s Mem. at 17. The other items listed in the form use terms like "policy" or "guide." *See* Pl.'s Mem. at 17. Acosta argues that this distinctive treatment evinces an intent that these two documents—the Non-Solicitation Agreement and Confidentiality Agreement—created contractual agreements between Acosta and Navitsky. *See id.*

Even in light of this distinction and the "fully comply" language, the court struggles to see how an agreement that states "the information and content contained in these items is

---

[7] As noted in JOH's memorandum of law, there "is no real choice of law issue here, as Florida and Pennsylvania law do not conflict with respect to the contract formation issue." Def. Johnson O'Hare's Mem. in Opp. to Pl.'s Am. Mot. for Injunctive Relief at ECF p. 18 n. 1 ("JOH's Mem."), Doc. No. 51. Under Pennsylvania law, the incorporating document must "bring the terms of the incorporated document into itself as if fully set out," *i.e.*, the incorporating document must show an intent to incorporate the other document. *Camp Ne'er Too Late, LP v. Swepi, LP*, 185 F. Supp. 3d 517, 547 (M.D. Pa. 2016) (citation and quotation marks omitted). This standard is essentially the same as the Florida standard. *Compare id.*, *with Tremarco Indus., Inc.*, 705 So. 2d at 984.

designed to serve as a guideline for action, and is not intended to create any contract or binding agreement between Acosta Sales & Marketing and any associate" shows an intent to incorporate the Non-Solicitation Agreement into a single contract. *See Tremarco*, 705 So. 2d at 984. The agreement versus policy distinction, combined with the "fully comply" language, gives Acosta, at most, a possibility of success on the merits. However, "more than a mere possibility of relief is required." *Reilly*, 858 F.3d at 179 n. 3 (citation and quotation marks omitted). Not only has Acosta failed to show the requisite likelihood of success on the merits, the "net harm" an injunction would prevent here is incredibly minimal. Consequently, injunctive relief is not warranted on the basis of Acosta's breach of contract claim.

### 2. Tortious Interference With Contract

Acosta contends that it has a reasonable probability of success on the merits on its tortious interference claim against JOH. *See* Pl.'s Mem. at 18–20. Acosta claims that JOH intentionally interfered with contracts it had with Navitsky, Barbara Brown, and Robert Levine. *See id.* To establish a tortious interference claim in Pennsylvania, a plaintiff must establish:

> 1) the existence of a contractual or prospective contractual relation between the complainant and a third party; 2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; 3) the absence of a privilege or justification on the part of the defendant; and 4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Synthes (USA) v. Globus Med., Inc.*, No. 04-cv-1235, 2007 WL 2043184, at *8 (E.D. Pa. July 12, 2007).

On this record, the second element is glaringly absent. Acosta has provided absolutely no evidence that JOH ever acted with a "specific intent" to harm any of these alleged contractual

relationships.[8]  As was the case with Acosta's breach of contract claim, not only has it not shown a likelihood of success on the merits of this claim, but an injunction would only prevent minimal harm to Acosta.  Consequently, Acosta is not entitled to preliminary injunctive relief on this claim.

### 3. Trade Secrets

Acosta contends that it has a reasonable likelihood of success on the merits of its trade secrets claim.  *See* Pl.'s Mem. at 20–23.  Acosta believes that JOH and Navitsky have violated both the PUTSA and DTSA.  *See id.* at 20.  To succeed under either statute, the plaintiff must first establish the existence of a trade secret.  *See, e.g.*, *FCA US LLC, v. Bullock*, No. 17-CV-13972, 2018 WL 1064536, at *3 (E.D. Mich. Feb. 26, 2018) (refusing to find likelihood of success on merits because plaintiff likely would not be able to establish existence of trade secret); *CentiMark Corp. v. Jacobsen*, No. 11-cv-1137, 2011 WL 5977668, at *9 (W.D. Pa. Nov. 29, 2011) (noting first element of trade secrets claim is "the existence of a trade secret" (citation and quotation marks omitted)).  Under the PUTSA, a trade secret is:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S. § 5302.

---

[8] Acosta contends that "after being solicited to join JOH . . . [Navitsky] sent to one of JOH's Vice Presidents a copy of the Non-Solicitation Agreement 'in extreme confidence.'"  Pl.'s Mem. at 18.  The mere fact that JOH knew about this agreement does not lead to the conclusion that it acted with "specific intent" to harm the alleged underlying contractual relationship.  This is especially true in light of the persuasive reasons discussed above to find that Navitsky likely was not even bound by the Non-Solicitation Agreement.  Additionally, it appears that both JOH and Navitsky believed that the Non-Solicitation Agreement only prohibited Navitsky from soliciting Acosta clients.  *See* Tr. I at 208, 220, 239–41.

The DTSA defines trade secrets as follows:

**(3)** the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

**(A)** the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (alteration to original).

The court finds that it is unlikely that Acosta will be able to show that any of the documents Navitsky took included trade secrets.[9] Under either the PUTSA or DTSA, the purported trade secret must derive independent economic value from not being generally known or easily ascertainable through proper means by someone who could obtain economic value from the information. On this record, Acosta's prospects at showing they derived independent economic value from these documents not being generally known are not promising. In fact, it is not even clear from the record that this information is not generally available. Most of the information is not held exclusively by Acosta (*i.e.*, it is also held by someone other than Acosta (such as the client)). *See* Tr. I at 81, 228–34. And much of the data contained in the documents appears to be easily accessible to anyone with experience in the field. *See id.* at 84–89, 224, 228–34, 264–65; *see also Jacobsen*, 2011 WL 5977668, at *9 (noting that, under PUTSA, for

---

[9] Acosta has neither identified specific trade secrets nor affirmatively argued through the elements for an alleged trade secret. Rather, Acosta pointed to a group of documents and alleged, generally, that they are trade secrets. *See* Pl.'s Mem. at 20–23; Pl.'s Proposed Findings of Fact and Conclusions of Law at 6–7, 14–17, Doc. No. 49; Navitsky Ex. 3 at 3–4. The closest Acosta came to identifying a specific trade secret was its discussion of certain exhibits during examinations. *See, e.g.*, Tr. I at 261–62 (discussing Exhibit 16 during direct examination of Navitsky).

business information to be a trade secret "the information must be particular to the employer, [and] not general secrets of the trade in which the employer is engaged" (alteration to original)). Additionally, the economic value of this information is doubtful as much of the information is incredibly time sensitive (*i.e.*, it depreciates quickly in value as it ages). See Tr. I at 93–94, 222–23.

Acosta frequently pointed to the "confidential" nature of these documents, but just because a document is confidential does not mean that it is a trade secret. *See, e.g.*, Pl.'s Mem. at 21. For example, Acosta argued that the wholesale product pricing information contained in Navitsky Exhibit 16 is a trade secret because it is confidential. *See* Tr. I at 251–52, 261–62. Acosta contended that this information is confidential because the client, Sartori, would not want another customer (such as Ahold) to have it. *See id.* Sartori would not want another customer to have the document because it contains Sartori's wholesale pricing with the customer Wakefern. *See* Navitsky Ex. 16. However, counsel for Navitsky effectively pointed out during his examination, that the information contained in this document could easily be discovered by anyone with substantial experience in the market. *See* Tr. I at 263–265. The court cannot conclude that information readily available to anyone with experience in the field, such as the information contained in Exhibit 16, is a trade secret.

In sum, Acosta's chances of proving the existence of a trade secret are slim. And even if Acosta has more than a slim chance of establishing the existence of a trade secret, its chances certainly are not great enough to overcome the minimal harm an injunction would prevent. In balancing the first two factors, because the harm an injunction would prevent is minimal, the likelihood of success on the merits must be stronger. Acosta has not shown a substantial—or

even anything more than a minimal—chance of success on the merits on this claim. Consequently, Acosta is not entitled to a preliminary injunction on its trade secrets claim.

## IV. CONCLUSION

In conclusion, Acosta has failed to show the two most critical factors weigh in favor of granting preliminary injunctive relief. The harm an injunction would prevent here is minimal. And Acosta has failed to show that it has a likelihood of success on its (1) breach of contract claim, (2) tortious interference claim, or (3) trade secrets claim. As a result, the court denies the amended motion for a preliminary injunction.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.